**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| BRANDON GUERRA, individually, and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>CGM, L.L.C. d/b/a CGM, INC.,<br>Defendant, | Case No.<br>**CLASS ACTION COMPLAINT**<br>DEMAND FOR JURY TRIAL |

Plaintiff Brandon Guerra ("Plaintiff") brings this Class Action Complaint against CGM, L.L.C. d/b/a CGM, Inc. ("CGM" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personally identifiable information of its customers, including, but not limited to, their names and Social Security numbers (Collectively, "Private Information" or "PII").

2. Defendant CGM is a software development and data processing company based in Roswell, Georgia that provides "a compliance-centric, SAAS solution to help wireless and broadband companies participate in the federal

Affordable Connectivity Program (ACP) and Lifeline Program."[1] "[CGM's] support services suite delivers tools to confirm subscriber eligibility, enroll low-income households, track agent and distribution activity, calculate and file federal and state reimbursements, and provide audit support to [its] Service Provider clients.[2] CGM employs more than 25 people and generates approximately $6 million in annual revenue.[3]

3. Defendant is a sophisticated software development and data processing company and regularly maintains consumer information it knows to be sensitive. Moreover, CGM is aware of the consequences that would result to those consumers if the information were to be compromised and its corresponding obligation to protect against such compromise.

4. On December 28, 2022, CGM learned that an unauthorized external party gained access to certain systems within its network and acquired information from a number of CGM clients, including the PII of Plaintiff and Class Members (the "Data Breach").

5. Upon information and belief, Defendant was targeted in the cyberattack due to the high volume of sensitive PII that it collected and maintained on its

---

[1] See https://www.cgmllc.net/ (last accessed on June 20, 2023).

[2] *Id.*

[3] https://www.jdsupra.com/legalnews/cgm-inc-files-notice-of-data-breach-9865489/ (last accessed on June 20, 2023).

computer networks and/or systems and the high value of that information to cyber criminals in facilitating identity theft and fraud.

6. On or around June 7, 2023, CGM began notifying Plaintiff and Class Members and various states Attorneys General of the Data Breach.

7. By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. CGM admits that the unencrypted PII obtained by an unauthorized external party included names and Social Security numbers.

8. The exposed PII of Plaintiff and Class Members was targeted due to its value on the dark web. Hackers target and sell to criminals the unencrypted and unredacted PII that they exfiltrate from companies like Defendant. Plaintiff and Class Members now face a present and continuing lifetime risk of: (i) identity theft, which is heightened here by the loss of Social Security numbers in conjunction with other sensitive information; and (ii) the sharing and detrimental use of their sensitive information over which they have now been deprived of control.

9. The PII was targeted and compromised due to Defendant's negligent and/or careless acts and omissions and failure to protect the PII of Plaintiff and Class Members. In addition to Defendant's failure to prevent the Data Breach, Defendant waited several months after the Data Breach occurred to report it to the states'

Attorneys General and affected individuals. Defendant has also purposefully maintained as secret the specific vulnerabilities and root causes of the breach and have not informed Plaintiff and Class Members of that information.

10. As a result of this delayed response, Plaintiff and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm, including the sharing and detrimental use of their sensitive information. The risk will remain for their respective lifetimes.

11. Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failures to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

12. Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data

Breach, including but not limited to lost time; (iv) the disclosure of their private information; (v) failure to receive the benefit of their bargains with Defendant related to their financial products; (vi) nominal damages; (vii) the continued and certainly increased risk to their PII, and damages in an amount equal to the cost of securing identity theft products to assisting in monitoring and protecting them from identity theft, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

13. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

***Plaintiff Brandon Guerra***

14. Plaintiff Brandon Guerra is an adult individual and a natural person of California, residing in Riverside County, where he intends to stay. Plaintiff Guerra is a citizen of the State of California.

15. Plaintiff Brandon Guerra received a notice letter from Defendant dated June 7, 2023, informing him of the Data Breach and the exposure of his PII.

16. The notice letter informed Plaintiff that his name and Social Security number were accessed by unauthorized parties in the Data Breach.

***Defendant CGM, L.L.C. d/b/a CGM, Inc.***

17. Defendant CGM is a software development and data processing company organized under the laws of the United States with a principal place of business in Roswell, Georgia in Fulton County. CGM's principal place of business is located at 104 Sloan Street, Roswell, GA, 30075.

18. Among other things, CGM "provides a SAAS ("software as a service") solution to help wireless and broadband companies participate in the federal Affordable Connectivity Program (ACP) and Lifeline Program."[4] Through its programming, "CGM provides tools necessary to determine subscriber eligibility,

[4] https://www.jdsupra.com/legalnews/cgm-inc-files-notice-of-data-breach-9865489/ (last accessed on June 20, 2023).

enroll low-income households, track agent and distribution activity, calculate and file federal and state reimbursements, and provide audit support to CGM clients."[5] CGM employs more than 25 people and generates approximately $6 million in annual revenue.[6]

## III. JURISDICTION AND VENUE

19. This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member, including Plaintiff Brandon Guerra, is a citizen of a state different from CGM and its founding members to establish minimal diversity.

20. CGM is a citizen of Georgia because it is a Georgia Limited Liability Company and its principal place of business is in Roswell, Georgia. The members of CGM as an LLC are the following individuals: (1) Kevin Murphy, a citizen of Georgia; Ben E. Muraskin, a citizen of Georgia; and Charles Campbell, a citizen of Georgia. Thus, the Northern District of Georgia has general jurisdiction over CGM.

21. The Northern District of Georgia has personal jurisdiction over CGM because it conducts substantial business in Georgia and this District.

---

[5] *Id.*

[6] *Id.*

22. Venue is proper in this District under 28 U.S.C. §1391(b) because CGM operates in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

***Background***

23. Plaintiff and Class Members, who are past and current clients of CGM, provided and entrusted CGM with sensitive and confidential information, including but not limited to their names and Social Security numbers.

24. CGM is a is a software development and data processing company offering services in the areas of helping wireless and broadband companies participate in the federal Affordable Connectivity Program (ACP) and Lifeline Program.

25. As a condition of being a past or current client of CGM, CGM required that Plaintiff and Class Members entrust CGM with highly confidential PII.

26. Plaintiff and Class Members relied on CGM to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the integrity and confidentiality of their PII and demand security to safeguard their PII.

27. In addition to Plaintiff and Class Members' complete dependence on

CGM to protect their PII, because this was a readily foreseeable and preventable data breach, Defendant had duties to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties.

***The Data Breach***

28. On or about June 7, 2023, CGM sent Plaintiff and Class Members a *Notice of Data Breach* [7] in which CGM informed Plaintiff and other Class Members that:

> **What happened?** On December 28, 2022, we observed unusual activity related to certain systems within our network. We quickly began investigating to better understand the nature and scope of this activity. Working with third-party specialists, we determined that an unknown actor accessed our network <<Variable data 1/Exposure language>>. We promptly took steps to contain the threat and ensure the security of our systems. We simultaneously launched a full investigation designed to understand the nature and scope of what occurred and what information was stored on impacted systems at the time of the event.
>
> Based on our investigation, we determined that certain information related to you was found within the impacted systems.
>
> **What information was involved?** Our investigation determined that the information related to you that was subject to unauthorized access includes your <<data elements>>, and name. Although we have no evidence that any of your information was used for identity theft or

[7] Exhibit 1 (sample notice filed with Maine attorney general's office), *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/fdc0a65c-9a4c-401a-b278-5a83284956c7.shtml (last accessed on June 20, 2023).

> fraud, we are notifying you in an abundance of caution and providing information and resources to assist you in helping protect your personal information, should you feel it appropriate to do so.
>
> **What We Are Doing.** We take this event and the obligation to safeguard the information in our care very seriously. After discovering the suspicious activity, we promptly took steps to confirm our system security and engaged third-party cybersecurity specialists to assist in conducting a comprehensive investigation of the event to confirm its nature, scope, and impact. CGM also promptly notified federal law enforcement of the event. Further, as part of our ongoing commitment to the privacy and security of personal information in our care, we are reviewing and enhancing existing policies and procedures relating to data protection and security. We instituted additional security measures to minimize the likelihood ofsimilar events in the future. We are also notifying relevant regulatory authorities, as required.[8]

29. On or about June 7, 2023, CGM notified various state Attorneys General of the Data Breach, including the Office of the Maine Attorney General, and provided them "sample" notices of the Data Breach. CGM notified the Maine Attorney General that 279,063 individuals were affected by the Data Breach nationwide.

30. CGM admitted in the *Notice of Data Breach*, the letters to the Attorneys General, and the "sample" notices of the Data Breach that an unauthorized actor obtained sensitive information about Plaintiff and Class Members, including their

---

[8] *Id.*

names and Social Security numbers.

31. In response to the Data Breach, CGM claims that it has "promptly took steps to confirm [its] system security," that it is "reviewing and enhancing existing policies and procedures relating to data protection and security" and that it has "instituted additional security measures to minimize the likelihood of similar events in the future."[9] However, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiff and Class Members, who retain a vested interest in ensuring that their information remains protected.

32. As a result of the Data Breach, the unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web or fall into the hands of companies that will use the detailed PII for targeted marketing without the consent of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

33. Because Defendant had duties to protect Plaintiff's and Class Members' PII, Defendant should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

---

[9] *Id.*

34. In the years immediately preceding the Data Breach, Defendant knew or should have known that CGM's computer systems were a target for cybersecurity attacks, including attacks involving data theft, because warnings were readily available and accessible via the internet. In addition to articles in the public press about the extensive number of data breaches affecting companies throughout all industries, including the software development and data processing industry, governmental agencies have constantly sent and published notices of the need for companies, including those in the software development and data processing industry to carefully safeguard the sensitive and valuable information collected from consumers.

35. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) unauthorized actors were targeting companies such as CGM, (ii) unauthorized actors were aggressive in their pursuit of companies such as CGM, (iii) unauthorized actors were leaking corporate information on dark web portals, and (iv) unauthorized actors' tactics included threatening to release stolen data.

36. Given CGM's knowledge that the sensitive information it maintained would be targeted by hackers, CGM had a duty to ensure that it instituted appropriate data security procedures to guard against this threat.

37. In light of the information readily available and accessible on the

internet before the Data Breach, CGM, having elected to store that PII and other similar PII from other entities in an Internet-accessible environment, had reason to be on guard for the targeting and exfiltration of the PII at issue here. Defendant had cause to be particularly on guard against such an attack as a result of its foreknowledge.

38. Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack.

39. Prior to the Data Breach, Defendant knew or should have known that they should have encrypted the Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Data Breaches are Preventable.***

40. To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting

and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute

programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[10]

41. To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

[10] https://www.meritalk.com/articles/fbi-high-impact-ransomware-attacks-threaten-u-s-businesses-and-organizations/ (last accessed on June 20, 2023).

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[11]

42. Given that Defendant was storing the PII of so many individuals, Defendant could and should have implemented all the above measures to prevent and detect cyberattacks, and their failure to do so was negligent if not reckless

43. The occurrence of the Data Breach evidences that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiff and Class Members.

***Defendant Failed to Comply with FTC Guidelines***

44. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable

---

[11] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed on June 20, 2023).

data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

45. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[12]

46. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[13]

47. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for

[12] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed on June 20, 2023).
[13] *Id.*

security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

48. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49. These FTC enforcement actions include actions against companies like Defendant.

50. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

51. Defendant failed to properly implement basic data security practices.

52. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII or to comply with applicable

industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

53. Upon information and belief, Defendant was at all times fully aware of their obligation to protect the PII of their customers and clients, Defendant was also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

***Defendant Failed to Follow Industry Standards***

54. As noted above, experts studying cyber security routinely identify entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

55. Several best practices have been identified that, at a minimum, should be implemented by companies in possession of PII like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which customers can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

56. Other best cybersecurity practices that are standard for companies in possession of PII include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

57. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

58. These foregoing frameworks are existing and applicable industry standards for companies in possession of PII, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***The Data Breach was Foreseeable***

59. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store PII, like Defendant, preceding the date of the breach.

60. Data breaches, including those perpetrated against software development and data processing that store PII in their systems, have become widespread.

61. Defendant knew or should have known that these attacks were common and foreseeable. In 2022, there were 1,802 data breaches, nearly eclipsing 2021's record wherein 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68 percent increase from 2020.[14] The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[15]

62. The U.S. government, various U.S. and international law enforcement agencies, cybersecurity industry groups and laboratories, and numerous industry trade groups have issued warnings and guidance on managing and mitigating

[14] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6 (last accessed on June 20, 2023).
[15] See *Data Breaches Hit Lots More People in 2022* (Jan. 25, 2023) https://www.cnet.com/tech/services-and-software/data-breaches-hit-lots-more-people-in-2022/ (last accessed on June 20, 2023).

phishing and ransomware threats. There are industry best practices for cybersecurity related to phishing and ransomware, some of which are particularly effective.

63. For example, in 2019, both Microsoft and Google have publicly reported that using multi-factor authentication ("MFA") blocks more than 99% of automated hacks, including most ransomware attacks that occur because of unauthorized account access. Likewise, the reputable SANS Software Security Institute issued a paper stating "[t]ime to implement multi-factor authentication!"[16] An example of MFA implementation is receiving a text with a code when you input your username and password into a website; even if a cybercriminal knew your username and password, the cybercriminal would not be able to see the code on your phone and would thus be blocked from accessing your online account.

64. In this regard, implementing MFA "can block over 99.9 percent of account compromise attacks."[17]

---

[16] Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW]. Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW] (last accessed on June 20, 2023).

[17] *What Is Multi-Factor Authentication (MFA)?*, Consensus Techs. (Sept. 16, 2020), https://www.concensus.com/what-is-multi-factor-authentication/#:~:text=The%20proof%20 that%20MFA%20works,percent%20of%20account%20compromise%20attacks [https://perma.cc/RKT2-LX5Z] (last accessed on June 20, 2023).

65. Cyberattacks have become so notorious that the FBI and Secret Service issued an unprecedented warning in 2019 to potential targets so they were aware of, and prepared for, a potential attack.[18]

66. Cyberattacks and data breaches of financial services companies are especially problematic because of the potentially permanent disruption they cause to the daily lives of their customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[19]

67. The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[20]

68. The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[21]

---

[18] Kochman, *supra* n.171.

[19] Albert Khoury, *Scam alert: 5 most costly data breaches (plus 5 states most targeted)* (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/ (last accessed on June 20, 2023).

[20] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5] (last accessed on June 20, 2023).

[21] *Id*.

69. In light of recent high profile data breaches at industry leading companies, including, Microsoft (250 million records, December 2019), Capital One (98 million consumer's records, July 2019);Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

70. Additionally, as companies became more dependent on computer systems to run their business,[22] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[23]

71. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if CGM's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result

---

[22] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last accessed on June 20, 2023).
[23] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last accessed on June 20, 2023).

of a breach.

72. Defendant could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data they no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

73. Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

74. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

***Plaintiff and Class Members are under a Present and Continuing Risk of Identity Theft and Fraud***

75. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[24] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth,

[24] 17 C.F.R. § 248.201 (2013).

official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[25]

76. The FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

77. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

78. Plaintiff's and Class Members' PII is accurate and of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

[25] *Id.*
[26] *Identity Theft Recovery Steps*, FTC, https://www.identitytheft.gov/Steps [https://perma.cc/ME45-5N3A] (last accessed on June 20, 2023).

79. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

80. The fraudulent activity resulting from the Data Breach may not come to light for years.

81. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[27]

82. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime. And because Social Security numbers, names, and, practically speaking, home addresses

---

[27] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last accessed June 20, 2023).

are immutable information, the PII stolen in this breach can be used to target Plaintiff and Class Members for the remainder of their lives.

83. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[28]

84. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

85. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class

[28] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last accessed on June 20, 2023).

Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. Moreover, because much of the information at issue here includes immutable data like Social Security numbers, names, and, for all practical purposes, home addresses, Plaintiff's and Class Members' PII can be used to victimize them for the remainder of their lives.

86. The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiff and the other Class Members. And because the criminals here have either the full or the first eight numbers of Plaintiff's and Class Members' Social Security numbers, they can easily obtain the last four numbers, which are often used as identifiers, through techniques like social engineering.

87. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

88. Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

89. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

90. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[29]

91. What is more, it is no easy task to change or cancel a stolen Social

[29] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed June 20, 2023).

Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

92. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[30]

93. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts, although cyber criminals can still use this information to develop synthetic identities and can engage if financial crimes. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

---

[30] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed June 20, 2023).

94. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[31]

95. Plaintiff and Class Members now face a lifetime of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

96. The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

***Value of Personal Identifiable Information***

97. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to

[31] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed June 20, 2023).

$200.[32] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[33] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[34]

98. An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[35]

99. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[36,37]

100. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[38]

---

[32] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed June 20, 2023).
[33] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed June 20, 2023).
[34] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed June 20, 2023).
[35] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed June 20, 2023).
[36] https://datacoup.com/ (last accessed June 20, 2023).
[37] https://digi.me/what-is-digime/ (last accessed June 20, 2023).
[38] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed June 20, 2023).

101. Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[39]

102. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

103. Defendant was, or should have been, fully aware of the unique type and the significant volume of data contained in the PII that CGM stored, amounting to potentially thousands of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

104. To date, CGM has offered Plaintiff and Class Members only one year of personal information misuse detection and identity protection support through TransUnion. The offered service is inadequate to protect Plaintiff and Class Members from the threats they face for the remainder of their lives in light of the PII

[39] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed June 20, 2023).

at issue here.

105. That Defendant is encouraging Plaintiff and Class Members to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted individuals' PII was acquired, thereby subjecting Plaintiff and Class Members to a substantial and imminent threat of fraud and identity theft.

106. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

***Plaintiff Brandon Guerra's Experience***

107. Plaintiff Brandon Guerra is very careful about sharing his sensitive PII. As a result, he has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff stores any documents containing his sensitive PII in a safe and secure location. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing them as needed to ensure his information is protected.

108. Plaintiff Brandon Guerra only allowed Defendant to maintain, store, and use his PII because he believed that Defendant would use basic security measures to protect his PII, such as requiring passwords and multi-factor authentication to access databases storing his PII. As a result, Plaintiff's PII was within the possession and control of Defendant at the time of the Data Breach.

109. In the instant that his PII was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

110. Plaintiff has been further injured by the damages to and diminution in value of his PII—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his PII was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

111. The Data Breach has also caused Plaintiff to suffer present and continuing injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

112. In addition to the present and continued risk and the actual harm suffered, the Data Breach has caused Plaintiff to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Notice letter, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

113. Defendant CGM acknowledged the risk posed to Plaintiff and his PII, both by explicitly stating that it "take[s] this event and the obligation to safeguard the information in our care very seriously" and by offering temporary

complimentary monitoring for one year through TransUnion.

114. The present and continuing risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety.

115. Plaintiff has a continuing interest in ensuring that Plaintiff's PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

## V. CLASS ALLEGATIONS

116. Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

117. The Nationwide Class that Plaintiff seeks to represent is preliminarily defined as follows:

> All individuals whose PII was compromised in the data breach that is the subject of the Notice of Data Breach that CGM sent to Plaintiff and Class Members on or around June 7, 2023 (the "Nationwide Class").

118. In addition to the Nationwide Class, Plaintiff and Class Members seek to represent the following subclasses.

119. Plaintiff Brandon Guerra also seeks to represent a class of California residents preliminarily defined as follows:

> All individuals who reside in the state of California whose PII was compromised in the data breach that is the subject of the Notice of Data Breach that CGM sent to Plaintiff

and Class Members on or around June 7, 2023 (the "California Class").

120. Excluded from the Class and Subclasses are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

121. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

122. Numerosity, Fed R. Civ. P. 23(a)(1): The Nationwide Class (the "Class") are so numerous that joinder of all members is impracticable. Defendant has identified hundreds of thousands of individuals whose PII was compromised in the Data Breach, and the Class is apparently identifiable within Defendant's records. CGM notified the Office of the Maine Attorney General that 279,063 individuals were affected by the Data Breach.

123. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had duties to protect the PII of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e. When Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

l. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

m. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

124. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

125. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

126. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately

represent and protect the interests of the Class Members in that he has no disabling conflict of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

127. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

128. The nature of this action and the nature of laws available to Plaintiff

and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

129. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

130. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

131. Unless a Class-wide injunction is issued, Defendant may continue in their failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach,

and Defendant may continue to act unlawfully as set forth in this Complaint.

132. Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

133. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed legal duties to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendant breached a legal duties to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between CGM on the one hand, and Plaintiff and Class Members on the other, and the terms of that

implied contract;

e. Whether CGM breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members; and,

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class against Defendant)**

134. Plaintiff re-alleges and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

135. Plaintiff and Class Members were required to submit non-public PII as a condition of obtaining products and/or services from Defendant and/or one of Defendant's client companies.

136. Plaintiff and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information and delete it once it was no longer required to retain it after the end of the consumer relationship.

137. Defendant had a duty to employ reasonable security measures and otherwise protect the PII of Plaintiff and Class Members.

138. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

139. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

140. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected

in the case of a data breach.

141. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

142. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;
b. Failing to adequately monitor the security of its networks and systems;
c. Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards; and
d. Allowing unauthorized access to Class Members' PII.

143. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

144. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

145. Plaintiff and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored in an Internet-accessible environment.

146. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Nationwide Class involved an unreasonable risk of harm to Plaintiff and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

147. Plaintiff and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

148. Defendant was in an exclusive position to protect against the harm suffered by Plaintiff and the Nationwide Class as a result of the Data Breach.

149. There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

150. As a result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not

limited to: (i) lost or diminished value of PII; (ii) invasion of privacy; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the PII.

151. Plaintiff and Class Members are entitled to nominal, compensatory, and consequential damages suffered as a result of the Data Breach as well as any other relief allowed by law.

152. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## Negligence *per se*
## (On Behalf of Plaintiff and the Nationwide Class against Defendant)

153. Plaintiff re-alleges and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

154. Plaintiff and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information and delete it once it was no longer required to retain it after the end of the consumer relationship.

155. Defendant had a duty to employ reasonable security measures and otherwise protect the PII of Plaintiff and Class Members.

156. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

157. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

158. Plaintiff and Class Members were within the Class of Persons the FTC Act was intended to protect and the consequences of the Data Breach are the types of harm against which the statutes were intended to protect.

159. Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts

and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards; and

d. Allowing unauthorized access to Class Members' PII.

160. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

161. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

162. Plaintiff and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored in an Internet-accessible environment.

163. As a result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: (i) lost or diminished value of PII; (ii) invasion of privacy; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

164. Plaintiff and Class Members are entitled to nominal, compensatory, and consequential damages suffered as a result of the Data Breach as well as any other relief allowed by law.

165. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class against Defendant)**

166. Plaintiff re-alleges and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

167. When Plaintiff and Class Members paid for services and provided their PII to CGM, they did so on the mutual understanding and expectation that CGM would use a portion of those payments, or revenue derived from the use of their PII, to adequately fund data security practices.

168. Upon information and belief, CGM funds their data security measures entirely from their general revenues, including payments made by or on behalf of Plaintiff and Class Members and revenue derived from the PII provided by Plaintiff and Class Members.

169. As such, a portion of the payments made by or on behalf of Plaintiff and Class Members, or the revenue derived from their PII, is to be used by Defendant to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

170. Defendant enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and instead directing those funds to their own profits. Instead of providing a reasonable level of security that would have prevented the hacking

incident, Defendant instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize their own profits over the requisite security.

171. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

172. For years and continuing to today, Defendant's business models have depended upon their use of consumers' PII. Trust and confidence are critical and central to the services provided by Defendant in the software and data processing industry. Unbeknownst to Plaintiff and absent Class Members, however, Defendant did not secure, safeguard, or protect its customers' data and employed deficient security procedures and protocols to prevent unauthorized access to customers' PII. Defendant's deficiencies described herein were contrary to their security messaging.

173. Plaintiff and Class Members received services from Defendant, and Defendant were provided with, and allowed to collect and store, their PII on the mistaken belief that Defendant complied with their duties to safeguard and protect its customers' PII.

174. Upon information and belief, putting their short-term profit ahead of

safeguarding PII, and unbeknownst to Plaintiff and Class Members, Defendant knowingly sacrificed data security to save money at their expense and to their detriment.

175. Upon information and belief, Defendant knew that the manner in which it maintained and transmitted customer PII violated industry standards and its fundamental duties to Plaintiff and Class Members by neglecting well accepted security measures to ensure confidential information was not accessible to unauthorized access. Defendant had knowledge of methods for designing safeguards against unauthorized access and eliminating the threat of exploit, but it did not use such methods.

176. Defendant had within its exclusive knowledge, and never disclosed, that it had failed to safeguard and protect Plaintiff and Class Members' PII. This information was not available to Plaintiff, Class Members, or the public at large.

177. Defendant also knew that Plaintiff and Class Members expected security against known risks and that they were required to adhere to state and federal standards for the protection of confidential personally identifying, financial, and other personal information.

178. Plaintiff and Class Members did not expect that Defendant would knowingly insecurely maintain and hold their PII when that data was no longer needed to facilitate a business transaction or other legitimate business reason.

Likewise, Plaintiff and Class Members did not know or expect that Defendant would employ substantially deficient data security systems and fail to undertake any required monitoring or supervision of the entrusted PII.

179. Had Plaintiff and Class Members known about Defendant's deficiencies and efforts to hide their ineffective and substandard data security systems, Plaintiff and Class Members would not have entered into business dealings with Defendant.

180. By withholding the facts concerning the defective security and protection of customer PII, Defendant put their own interests ahead of the very customers who placed their trust and confidence in Defendant and benefitted themselves to the detriment of Plaintiff and Class Members.

181. It would be inequitable, unfair, and unjust for Defendant to retain these wrongfully obtained fees and benefits. Defendant's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

182. Plaintiff and Nationwide Class Members have no adequate remedy at law.

183. Plaintiff and each Member of the proposed Class are each entitled to restitution and non-restitutionary disgorgement in the amount by which Defendant were unjustly enriched, to be determined at trial.

## COUNT IV
## INVASION OF PRIVACY
## (On Behalf of Plaintiff and the Nationwide Class against Defendant)

184. Plaintiff re-alleges and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

185. Plaintiff and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

186. Defendant owed a duty to Plaintiff and Class Members to keep their PII contained as a part thereof, confidential.

187. Defendant failed to protect and released to unknown and unauthorized third parties the non-redacted and non-encrypted PII of Plaintiff and Class Members.

188. Defendant allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiff and Class Members, by way of Defendant's failure to protect the PII.

189. The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and Class Members is highly offensive to a reasonable person.

190. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members disclosed their PII to Defendant as part of their relationships with Defendant, but privately with an intention that the PII

would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

191. The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

192. Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

193. Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

194. Moreover, Defendant also has a duty under the Georgia Constitution ('the Constitution') which contains a Right to Privacy clause, Chapter 1, Article 1, to protect its users' private information. The Georgia Constitution states "no person shall be deprived of life, liberty, or property except by due process of law." Moreover, the Georgia Constitution identifies certain invasions of privacy, including the Public Disclosure of Private Life which prohibits the public disclosure of private facts.

195. This duty has been recognized by the Georgia Supreme Court in the Restatement of the Law of Torts (Second) §652A which specifically recognized four common law invasion of privacy claims in Georgia, which include 1) appropriation of likeness; 2) intrusion on solitude or seclusion; 3) public disclosure of private facts; and 4) false light.

196. CGM's implementation of inadequate data security measures and its abdication of its responsibility to reasonably protect data it required Plaintiff and the Class to provide and stored on its own servers and databases constitutes a violation of the Georgia Constitution and the Restatement of the Law of Torts (Second).

197. As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiff and Class Members was disclosed to third parties without authorization, causing Plaintiff and Class Members to suffer damages.

198. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

**COUNT V**
**Violation of California's Unfair Competition Law ("UCL")**
**(On Behalf of California Plaintiff and the California Class against Defendant)**

199. Plaintiff and the California Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

200. The UCL prohibits any "unlawful" or "unfair" business act or practice, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant engaged in unlawful and unfair practices within the meaning, and in violation, of the UCL.

201. In the course of conducting its business, Defendant committed "unlawful" business practices by, inter alia, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and California Class Members' PII, and by violating the statutory and common law alleged herein, including, inter alia, the Section 5 of the FTC Act. Plaintiff and California Class members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

202. Defendant also violated the UCL by failing to timely notify Plaintiff

and California Class members pursuant to Civil Code § 1798.82(a) regarding the unauthorized access and disclosure of their PII. If Plaintiff and California Class members had been notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII and identities.

203. Defendant also violated the UCL by failing to abide by its posted privacy policy.

204. Defendant violated the unfair prong of the UCL by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiff's and California Class Members' PII with knowledge that the information would not be adequately protected; and by storing Plaintiff's and California Class Members' PII in an unsecure electronic environment.

205. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and California Class members. They were likely to deceive the public into believing their PII was securely stored when it was not. The harm these practices caused to Plaintiff and California Class members outweighed their utility, if any.

206. Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends

legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous.

207. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws, California's California Consumer Privacy Act and Confidentiality of Medical Information Act, and the FTC Act (15 U.S.C. § 45). The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

208. Plaintiff and California Class Members suffered injury in fact and lost money or property as a result of Defendant's violations of statutory and common law. Plaintiff and the California Class suffered from overpaying for services that should have included adequate data security for their PII, by experiencing a diminution of value in their PII as a result if its theft by cybercriminals, the loss of Plaintiff's and California Class Members' legally protected interest in the confidentiality and privacy of their PII, the right to control that information, and additional losses as described above.

209. Plaintiff and California Class Members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form

of, inter alia, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) deprivation of the value of their PII for which there is a well-established national and international market, and/or (v) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

210. Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. As such, Plaintiff, on behalf of himself and California Class Members, seek restitution and an injunction, including public injunctive relief prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203. To the extent any of these remedies are equitable, Plaintiff and the California Class seek them in the alternative to any adequate remedy at law they may have.

**COUNT VI**
**Violation of the California Consumer Privacy Act**
**Cal. Civ. Code §§ 1798.100, *et. seq.* ("CCPA")**
**(On Behalf of California Plaintiff and the California Class against Defendant)**

211. Plaintiff and the California Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

212. As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access and disclosure. The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."

213. As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendant failed to implement

such procedures which resulted in the Data Breach.

214. It also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(c).

215. Section 1798.150(a)(1) of the CCPA provides:

> "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper."

216. Plaintiff and California Class Members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

217. Defendant is a "business" as defined by Civ. Code § 1798.140(c)

because Defendant:

a. is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

b. "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

c. does business in California; and

d. has annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or in combination, the personal information of 100,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

218. The Private Information taken in the Data Breach is personal information as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiff's and California Class Members' unencrypted first and last names and Social Security numbers among other information.

219. Plaintiff and California Class Members' Private Information was subject to unauthorized access and exfiltration, theft, or disclosure because their Private Information, including name and contact information was wrongfully taken, accessed, and viewed by unauthorized third parties.

220. The Data Breach occurred as a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiff's and California Class Members' Private Information. Defendant failed to implement reasonable security procedures to prevent an attack on their server or network, including its email system, by hackers and to prevent unauthorized access of Plaintiff's and California Class Members' PII as a result of this attack.

221. On June 21, 2023, Plaintiff provided Defendant with written notice of its violations of the CCPA, pursuant to Civil Code § 1798.150(b)(1). If Defendant fails to respond, or has not cured or is unable to cure the violation within 30 days thereof, Plaintiff will amend this Complaint to seek all relief available under the CCPA including damages to be measured as the greater of actual damages or statutory damages in an amount up to seven hundred and fifty dollars ($750) per consumer per incident. See Cal. Civ. Code § 1798.150(a)(1)(A) & (b).

222. As a result of Defendant's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks

injunctive relief, including public injunctive relief, declaratory relief, and any other relief as deemed appropriate by the Court.

## COUNT VII

**Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq***

**(On Behalf of Plaintiff and the Nationwide Class against Defendant)**

223. Plaintiff and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

224. Plaintiff brings this Count on behalf of himself and on behalf of the Nationwide Class.

225. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Further, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

226. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and the Nationwide Class's PII and whether Defendant are currently maintaining data security measures adequate to protect Plaintiff and the Nationwide Class from further data breaches that compromise their PII. Plaintiff and the Nationwide Class allege that Defendant's data security measures remain inadequate. Defendant publicly denies these allegations. Furthermore, Plaintiff and the Nationwide Class continue to suffer injury as a result of the compromise of their

PII and remain at imminent risk that further compromises of their PII will occur in the future. It is unknown what specific measures and changes Defendant has undertaken in response to the Data Breach.

227. Plaintiff and the Nationwide Class have an ongoing, actionable dispute arising out of Defendant's inadequate security measures, including (i) Defendant's failure to encrypt Plaintiff's and the Nationwide Class's PII, including driver's license numbers, while storing it in an Internet-accessible environment and (ii) Defendant's failure to delete PII it has no reasonable need to maintain in an Internet-accessible environment, including the driver's license number of Plaintiff and the Nationwide Class.

228. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure the PII that they continue to maintain;

b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII; and

c. Defendant's ongoing breaches of their legal duty continue to cause Plaintiff and the Nationwide Class harm.

229. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and

industry and government regulatory standards to protect consumers' PII. Specifically, this injunction should, among other things, direct Defendant to:

a. engage third party auditors, consistent with industry standards, to test their systems for weakness and upgrade any such weakness found;
b. audit, test, and train their data security personnel regarding any new or modified procedures and how to respond to a data breach;
c. regularly test their systems for security vulnerabilities, consistent with industry standards; and
d. implement an education and training program for appropriate employees regarding cybersecurity.

230. If an injunction is not issued, Plaintiff and the Nationwide Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff and the Nationwide Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

231. The hardship to Plaintiff and the Nationwide Class if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and the Nationwide Class will likely be subjected to substantial identity theft and other

damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

232. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and the Nationwide Class and others whose confidential information would be further compromised.

**COUNT VII**
**Violations of Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370 *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class against Defendant)**

233. Plaintiff and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

234. Plaintiff and Class Members are "persons" within the meaning of O.C.G.A. § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

235. Defendant engaged in deceptive trade practices in the conduct of its business, in violation of Ga. Code § 10-1-372(a), including:

- Representing that goods or services have characteristics that they do not have;
- Representing that goods or services are of a particular standard, quality, or grade if they are of another;
- Advertising goods or services with intent not to sell them as advertised;
- Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

236. **Defendants' deceptive trade practices include, *inter alia*:**

a. Implementing and maintaining cybersecurity and privacy measures that were knowingly insufficient which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of individuals including duties imposed by the Federal Trade Commission Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach; and,

d. Omitting, suppressing, and concealing the material fact that Defendant did not reasonably or adequately secure Plantiff's and Class Members' PII.

237. Defendant's omissions were material because they were likely to and did deceive Plaintiff and Class Members about the adequacy of Defendant's data security.

238. As a direct and proximate result of Defendant's actions, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

239. Plaintiff and the Class Members seek all relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs under Ga. Code § 10-1-373.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Nationwide Class and Subclass and appointing Plaintiff and his Counsel to represent such Class and Subclass;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v. prohibiting Defendant from maintaining the PII of Plaintiff and

Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of CGM network is compromised, hackers cannot gain access to other portions of CGM's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training

for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor CGM's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from CGM's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses pursuant to O.C.G.A. § 13-6-11 and as otherwise allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

DATED: June 22, 2023

Respectfully submitted,

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson
Georgia Bar No. 725843
N. Nickolas Jackson
Georgia Bar No. 841433
**The Finley Firm, P.C.**
Building 14, Suite 230
3535 Piedmont Road
Atlanta, GA 30305
Phone: 404-320-9979
Fax: 404-320-9978
Email: mgibson@thefinleyfirm.com
Email: njackson@thefinleyfirm.com

M. ANDERSON BERRY *
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Fax: (916) 924-1829
Email: aberry@justice4you.com

JASON WUCETICH*
**WUCETICH & KOROVILAS LLP**
222 N. Pacific Coast Highway, Suite 2000
El Segundo, CA 90245
Telephone: (310) 335-2001
Fax: (310) 364-5201
Email: jason@wukolaw.com

*Attorneys for Plaintiff Brandon Guerra*
*and the Proposed Classes*

*PRO HAC VICE FORTHCOMING

**LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing pleading filed with the Clerk of Court has been prepared in 14-point Times New Roman font in accordance with Local Rule 5.1(C).

Dated: June 22, 2023.

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson